This is number 18-3682, Wallachia Williams v. City of York et al. Mr. Lavery? Thank you, Your Honor. As Your Honors know, this is a qualified immunity appeal, and it does turn purely on a legal issue, which would be allowed under the Barron's case, and that's going to be one of the major issues for you to decide here. But what it really comes down to is whether or not clearly established law prohibits what the named officers did at the scene of the stop and at the police station, considering the evidence in the light favorable to the appellees. Now, just to cut to the chase on this, we accept for purposes of this appeal that one of the officers officer cites threw the plaintiff, Felicia Williams, to the ground when he detained her. There's no dispute for purposes of this for that. Your argument is he had probable cause to arrest her. Absolutely. I'm going to get to that in a little bit, too. Well, yes, he definitely initially had reasonable suspicion for a terrorist stop, and it developed into probable cause. And if she had behaved like her boyfriend, she wouldn't have been thrown to the ground. Exactly. That's exactly it. In fact, she ran to an adjoining porch and then tried to get into the house. But those are facts. You started by saying we're here on a purely legal issue. And you said at the opening that we have to take the facts in the light most favorable to appellee. And that seems to be a light that's a little more favorable to your clients than to appellee. So I don't know if that's the basis for us to make a purely legal determination. Well, in that regard, Your Honor, it really isn't because I don't think it's disputed. I mean, the only thing that's really in dispute is how far she went. It's not a dispute that she didn't stop. The only thing that's really in dispute is how far she went. But she didn't stop right there. She went and ran onto a porch. And again, there's no dispute on the record on this and was banging on the door to get in. So there's not a factual determination that really needs to be made. In fact, that determination should have been made by the district court because it's clear. Also, let me just interrupt you again. Are we here to evaluate the underlying record, the facts in the record? Or are we here to evaluate on interlocutory appeal the decisions and the factual findings of the district court? Yeah, well, I think because those may not be the same. If you want to say the district court's decisions weren't in accord with the record, that's a great decision on normal appeal, on full appeal from a final order, not a co-and-be-beneficial-life interlocutory order. Now, what I'm saying, Your Honor, is simply that the facts here were undisputed. And there's also a line of cases that hold that where the district court doesn't make factual findings, which were not made here, this court can make those factual findings from the undisputed record. And that's an undisputed fact in this case. The degree of... In fact, it's in the judge's memorandum. I mean, it's not really open for debate. I mean, she did that. The only point where the parties would disagree on that is how far did she go, really. But that's right in the memo. I mean, the judge accepts that. And your argument is it's immaterial how far she went. It really isn't. What's material is the fact she didn't stop and she ran onto a porch. And at that point, you've got probable cause for escape. And then afterwards, if you look at her conduct at the scene, there's clearly probable cause at that point for disorderly conduct. And again, if you just look at... Is the threshold so low for disorderly conduct? Well, it's low. I mean, it's basically unreasonable noise or it's behavior that serves no useful purpose. And what undisputed facts in this record support disorderly conduct? Disorderly conduct. Again, we also have a... Well, if you go to, initially, the judge's memorandum and opinion on page 529, she indicates at that point the exchange that's there. And you can hear it. There's dash cam video here on this. So these really are not disputed facts. You've got dash cam... Can't see much on that dash cam video. Can't see, but you can hear. But you can hear a lot. So what can we hear? What you can hear is her being... That supports disorderly conduct. You can hear her yelling. You can hear her screaming. You can actually see her kicking on the ground, up kicking up at the office. Again, it's a very low threshold for summary disorderly conduct. And it's probable cause. They don't have to even prove that case beyond a reasonable doubt. And that's whether a reasonable officer at that point would have believed that the crime was committed and that that individual committed the crime. Mr. Lavery, let me interrupt you for a minute. You're at about the 10-minute mark. I don't recall you reserving time for rebuttal. Did you wish to do that? How much do I get, Judge? I haven't done this in a while. You have 15 total. So... May I... Give me two at the end, then. All right. And you're losing two minutes right now. All right. Okay. Go ahead. All right. Essentially, what we're saying is, look, if you look at the clearly established facts of record in this case, again, it's clearly... Here's what's clearly established. Hold on. I'm sorry. We have a problem with the clock. The clock should say 8... 7 minutes and 30 seconds instead of 3 minutes and 30 seconds. Thank you. But anyway, if you look at the... Here's really essentially what's undisputed from the record. And this is why qualified immunity applies. There was a shots fired call that happened. Officers pursue, people in the car bail out. No dispute on that at all. Also, no dispute that within literally minutes of that, Officer Figgs sees the plaintiff, and what turns out to be her boyfriend, running from the scene. Judge Rambo's opinion essentially says, reasonable suspicion. Terry, stop at that point. Then we get to the point where Figgs stops. Again, you got to remember, this is all happening quick. This is happening literally over 2 minutes. That's what this whole thing comes down to, literally. 2 minutes, it's a tense situation. I remember the Graham v. Conner language. All that, you can just put it right in the bucket for this one because that's what it literally is. You got a serious crime. She's running. The guy with her is running. He points the gun out of the car. At some point, he stops. She doesn't. Now, she doesn't go that far, but she goes onto the porch. She's banging on the door at that point. They go get her. They bring her back at that point. She's still arguing, fighting. Sights throws her to the ground. We admit that. Our point is that under those circumstances, that was not unreasonable for us. That bundle of facts equals probable cause to arrest. Oh, absolutely. I mean, let me just throw this in. I mean, from what I understand, though, there's other facts that are in play, such as the report of the two fleeing subjects, or that they were both male, and the clothing description that they were wearing didn't match, at a minimum, Plaintiff Appellee's clothing description, and that the report of flight was in a different direction, northbound, and they were running eastbound, the last of which I think is the least significant of the three. But the first two are fairly significant, because just because you think that there's a shooting and people are running, that's some of it. But totality is totality. It's not an incremental totality. It's everything together. And when everything together comes to play, you've got people. We can't stop a red car because a green car robbed a bank. No, but we have two people running away, and they were running in the same direction, running northbound, and the driver of the vehicle had been indicated to have been going northbound as well at that time. And I think that's a key fact as well. But what do you want the police to do under those circumstances? I mean... Can you stop a red car when a green car has the report of robbing a bank? But it wasn't... But that's not what it was. I mean, they didn't... Well, the answer is you can't, right? That's not probable cause. Oh, I agree. And so here we have a mis... We have the wrong gender in the sense that the report was two males, and we have a female. We have a description of clothes that she wasn't wearing. In fact, she was wearing, I think, a ledge, and we're taking the facts in most variable way pink, which was certainly not one of the descriptions that either of the two suspects had. So I guess I'm saying at some level, if you can't stop a red car when a green car robs a bank, at what level do those contrary facts have to enter a police officer's mind in the heat of pursuit in two minutes? It's a hard question. It is, Your Honor. And the other thing from the facts I think that are important here, too, is that none of that full description was known at that point. They knew that there were two males in the car, but there was also an indication that there may have been a third person in there as well at that point. I thought the third person was apprehended. That's if they may have at some point. I don't believe at that point. Again, it's what Sergeant Figg knows at that point. He certainly doesn't know that. All he knows is that there are three people, and at least the driver of the vehicle, two are males, and that the driver of the vehicle bails out and goes north. That's what he knows at that point. All right. But here's the other point. Let's assume that there was probable cause to arrest. Would you address the issue of excessive force at the station house? Because the Supreme Court's decision in Johnson v. Jones somewhat ties our hands as to what we have jurisdiction to review. And in your brief, you argue that Williams doesn't present any evidence that the officers used unreasonable force at the station, but the court determined that whether they used unreasonable force was a genuinely disputed issue of material fact. Under Johnson, don't we have no jurisdiction over that? No, because I think the issue there, and if you look at the record on there, it's clear, and I don't really think it's disputed in this case either,  but it's clear that none of the named officers are the officers that Ms. Williams claims did that. And it's axiomatic that in order to violate clearly established law, you have to have personal involvement. And that's the problem that you have here. I mean, at the scene, you have allegations that she's treated roughly. Never identified by who. Who treated her roughly? She was treated like a man, whatever that means, and sites throw her to the ground. That's the sum of... I'm not talking about the ground. I'm talking about the station house. Well, I'm getting to that. But again, there's supposed to be a genuine issue of facts there. At the station house, the only material facts really that are important here are there are, what, three named officers here, Monty, Fig, and Sites. And the record is undisputed. And I would really say, take a look at their brief. That plaintiff testified that it was not any of those three officers who engaged in that conduct at the station. So the reason it's qualified immunity is you can't violate clearly established law when you can't show the personal involvement of the person that's involved there. And none of these three officers did that. Isn't there a claim of supervised reliability because Fig's ordered the second handcuffing at a minimum? I don't believe there's a claim for supervised reliability in the case on the part of Fig. But even if he did order the handcuffing, he didn't order it to be put the way it was put on or to twist her arm. He didn't do anything like that. So, I mean, again, and that's Fig. What did Monty do? What did Sites do there? Didn't do anything. By her own admission. Why should we even be here at this point when we have the admission, literally, of the plaintiff that these officers didn't do it? Let me just follow up on that, your line of questions. What did everyone do? What did Monty do at the probable cause stage? I thought he was arresting and working on the detention of the then boyfriend. He was. Is there any involvement that he has at all? Okay. No, that's my point, Judge. That's why I'm kind of baffled by a lot of this. No. That's the thing. It's just all generically, the officers did, the police did. No, he didn't. And that's the point that we made in our brief, that he did not have involvement in that. And at least Sites and Monty had no involvement at the station. And Fig didn't grab her by the arm or twist her arm. And that's really the problem you have here. I mean, this is just in a vacuum. The police did this to me. Therefore, I named you three officers. Therefore, you three officers are liable for this. That's essentially what this case comes down to. And I think if the record is checked closely, it's going to bear that out. Are we reviewing the record or the district court's decision? I mean, I didn't take, oh, I'm sorry. I just have one question, Judge Hardiman. Going back to when she runs, does the record indicate when or if she was told to stop? Yes, the record indicates she was told to stop immediately. And there is, and I'll admit, there are... Immediately in the record? Yes, that is on the record. What's not agreed... Cite the record where that appears. If you go to page 3 of 29, Dr. Figg observed... I'm sorry, in the reproduced record, what page of the... I don't, it would be the judge's memorandum opinion, page 3 of 29. Sergeant Figg observed two people running away from the accident area in an eastbound direction on Princess Street. Sergeant Figg ordered those people to stop while reporting on the radio. That was the first time. And then he was also, if you go a little further down on that page, bottom of the page and the top of page 4, he also ordered the plaintiff and Scott to get on the ground. Scott was the companion. Scott did get on the ground. That's when she runs to the nearby porch and starts banging on the door. Were we looking for the word immediately in there? Wasn't Judge Nagar's question to whether the word immediately appears? Yeah, he observed two people running away from the scene. He ordered those people to stop while reporting on the radio at that point. So in... That's before he even gets out of his vehicle. In the district court opinion, it says, quote, the parties debate whether plaintiff and Scott stopped immediately upon Sergeant Figg's command or continue to run down the block. Should we resolve that issue in plaintiff's favor at this stage or should we look to the underlying record? You don't really need to, Judge, because the records specifically shows that she ran to an adjoining porch. How far she ran to that is in dispute, but she did not stop, did not get on the ground. She ran to the porch and was banging on the door to try to get in. That's not compliance. One more question on the issue of excessive force. How about Sykes at the scene? He was the one who threw her to the ground. Is that not correct? That is correct, Your Honor. Do we know if that was excessive under the circumstances? We would argue that it was not. You would argue that, but do we not have to look at what's going on around there? But I don't think there's much... Like I said, I don't think there's a whole lot of dispute that at that point she hadn't complied that we have a violent felony at that point. She had run up onto the porch. He grabbed her and he threw her down. I mean, I don't think those... I mean, to me, those are the material facts that you have here that really aren't in dispute. I mean, you can view them... They're just the facts. I guess they're not viewed in favor of anybody, but that's what happened. So I think under those circumstances, it's pretty clear at that point that a reasonable officer... It would not be clearly established that a reasonable officer could not throw a suspect down to the ground if that's all he did, and that's all it's alleged that he did do under those circumstances. Judge Nygaard, anything else before we hear from counsel for appellee? Thank you. No, I'm ready to move on. Okay, thank you. You have two minutes for rebuttal, Mr. Lavery. We'll hear from Ms. Bazio. Basil, Your Honor. Basil, I'm sorry. May it please the Court and counsel. I had a different beginning to this argument planned, but I would just like to call to the attention of the Court that much of what Mr. Lavery claims is undisputed is, in fact, not undisputed, and that is the very problem with an interlocutory appeal based on qualified immunity. I believe what appellants are asking the Court to do is to, in fact, overrule the District Court's determinations of undisputed facts, which it is our position that is inappropriate in the qualified immunity summary judgment context. All right, well, let's see if we can agree on what the facts are, because not all the facts are disputed, correct? That's correct. There are some that are undisputed. Many of them are disputed. Let me give you a recitation of what I understand to be undisputed, and you tell me if they are, in fact, disputed. Police officer defendants in this case received word of a shots fired on the evening in question. Correct. And they were advised that the car from which the shots were discharged included three people. Three male occupants, yes, Your Honor. Okay, so all three were identified as male. Correct, Your Honor. Okay, where in the record does it say that? It's in the radio transmissions. Do you happen to remember where in the record that was? Joint appendix 115A to 117A. So it's appendix, the second appendix then? Biggs deposition, three male occupants. Okay, I'm sorry, what was the appendix number again? It's 115 to 117, and then the call log that I referenced is joint appendix 240 at time 2035. 240, okay. You said at 1025? 2035, Your Honor. At page 240? Page 240, and then the call log has times, and it's time 2035 is what I have noted in my brief. Okay, and I see three guys in white car. Guys are male. Right? Guys are male, yes, Your Honor. Yes, okay, all right, thank you. All right, so we've got a report of three men, and then they come into the area, and they see two people running down the street, which is Williams and her boyfriend. Your Honor, the report is that the driver fled northbound, and that he saw the passenger flee southbound. Sergeant Figg drove, what we contend is about four blocks. He drove one block north, and then turned and drove three blocks east, and it was at that three block, he turned the corner and saw Ms. Williams and her then fiance running eastbound, not northbound. Okay, but this all takes place within about a minute. It does, Your Honor. And they're in the area. It's a couple blocks from the shooting. They are, and there's no dispute that they were running. The dispute is that they were fleeing from the scene or from any police officers. They were observed running eastbound within four blocks of the crash of the vehicle. Right, and apparently, based on what we know now, they were running because they were probably scared because they heard shots fired. Well, they were advised by a police officer to evacuate the park and... That's right. They were in a park, and it's undisputed that they were told by police, hey, get out of here. Correct. So they initially do what the police tell them, they get out of there. Correct. Okay. Is it also undisputed that your client was told to stop? Yes, it was one time. Sergeant Figg's testimony is that he told them to stop. He pointed his gun at them out the window. He stopped his car, pointed his gun at them out the window, and told them to get on the ground. Sergeant Figg did not get out of his car or move his car before Officer Monte arrived. How far could she have actually fled when he didn't move the car and didn't even get out of the car, and there she is at the scene when Officer Monte arrives. To handcuff Mr. Scott, which, by the way, we are not making a false arrest claim against Officer Monte. He, what he did, it was Seitz and Figg who made the decision to arrest Ms. Williams, and we made that clear in our brief, and... Okay, so Monte's off the hook for the false arrest. For the false arrest, that is correct. He did not play any role in the decision to arrest Ms. Williams. Okay, so Monte gets there. Figg is in the unmarked car, but he's in uniform. He sticks his gun out the car, and she's told... His gun is out the window, Your Honor, before Officer Monte arrives. It's what stopped them in the area where they were. Okay, then what happens? Ms. Williams, who's never been arrested, I presume she panicked, she sees a gun out the window of an unmarked car. He doesn't identify him as a police officer. I'm trying to go through it systematically because we want to avoid what we think might be in people's heads. So just tell us what is undisputed happened. After she's told to stop, then what happened? She goes onto the porch and... So she doesn't stop. Well, I think it depends on what you define as stop. She did not leave the immediate vicinity of where she was told to stop. Sergeant Figg's testimony... But was she on the porch when she was told to stop? I don't believe that there's evidence in the record that specifically... I would think not, but I don't believe that... It seems obvious that she wasn't, right? ...that would say that she was on the porch at the time because she was running down the street. And when she's told to stop, instead of stopping like her fiancé did, she goes to the porch. Correct. Maybe because she's afraid and wants to seek refuge in the house, right? Arguably, one could argue. But the point is she didn't stop. And then they go to the porch, and then what happens when they go to the porch? Officer, Sergeant Figg stays in the car until other officers arrive. So she's on the porch, but she stopped. And Sergeant Figg testified that the amount of time it took Mr. Scott and Ms. Williams to stop could be measured in seconds, and the distance they ran could be measured in feet. It was some small portion of a block. Okay, so then what happens when she's on the porch? Officer Seitz arrives, at which point Sergeant Figg directs him to handcuff her and tells him to arrest her for disorderly conduct. So all of the probable cause has to be based on what's happened up until this point in this scenario. Okay, how do we know that Figg determined that she should be arrested for disorderly conduct when she was standing on the porch before any of the ruckus that we heard on the dash cam occurred? It was Officer Seitz's testimony that he directed her to arrest him, her, for disorderly conduct. Okay, where is that in the record? 527 to 28 and 538 in Officer Seitz's deposition. Okay, so 527 of the record is Seitz's deposition. Correct. Okay, now what line should we look at at 527? I apologize, I don't have that. Oh, I'm sorry, that's okay. We can look at it. You're being very helpful by giving us the page numbers. Many lawyers don't give us the page numbers. What I will acknowledge based on what I have written in my brief is that Sergeant Figg directed Officer Seitz to handcuff Ms. Williams when he arrived at the scene before he left the scene. He directed him to arrest her for disorderly conduct. But he directed the... Our argument is he directed... Now we need to look at the record, though, because what I'm looking at at 527 is... This is testimony of Seitz that doesn't seem to help you because here's the question. Did someone tell you to arrest her? Answer, I was told to give her a citation. She was going to City Hall and given a citation for disorderly conduct. Question, when did they tell you to arrest her for disorderly conduct? Objection to form. Answer, when she was on the ground struggling with officers. That's not when she's on the porch behaving herself. No, correct. Our position is that the arrest... Well, we argue that the arrest occurred when she had a gun pointed at her and her movement was restricted. But at the point at which Sergeant Figg made the decision she was to be arrested and handcuffed, that was the point in time where we maintain that probable cause must be established as of that point in time. Right, but a minute ago you told us that he made that decision to cuff her and arrest her when she was just standing there on the porch banging on the door. 527 does not support that. What other record citations do you have to support? I apologize, Your Honor. Sergeant Figg directed sites to grab her, to cuff her while she was on the porch. As I mentioned when I gave you the citation, it was before he let her... All right, but that's not a decision to book her, you know, to bring her down the station for disorderly conduct, right? Well, we would argue that that was the point at which the arrest occurred. That was the arrest decision. When did the arrest... Because a minute ago you said, as I understand arrest happens at a point in time where an individual feels that they don't have liberty to leave. And I thought you said a minute ago that when an unmarked police car pulls up with a police officer in uniform, albeit, points a gun out the window and says, stop, that that is an arrest. So is that the first... That's the first arrest, right? We would argue that that could be the arrest or the point at which Figg offered... Well, we are here for pure legal questions and so one pure legal question... This is a pure legal question. And so it would be helpful to get your position on when the arrest... What arrest are we talking about here? Was that an arrest? Was that not an arrest? Because that, at least, is a legal question, I think. I would have to say that I believe that the initial seizure, I think you could argue it was arrest. I believe it's more properly categorized as an investigatory detention. But the point at which Officer Seitz was directed to handcuff Ms. Williams was the point at which the arrest decision was made. So Terry stopped until that point in time. At that point... That would have been... ...a full-blown arrest and seizure. That is correct. So your argument is the arrest occurred on the porch when she was cuffed on the porch? Well, there's a gap of time for execution, but we would argue that the arrest began when Sergeant Figg directed Officer Seitz to handcuff her. That was the point at which the arrest decision had been made and probable cause needed to exist as of that moment because Sergeant Figg is the one who made the arrest decision. So it was when he had probable cause and when he directed Seitz to handcuff her, that was the point at which the arrest decision was made. All right. It took some time to handcuff her and we maintain that different things happened than the officers maintained. Take us from the porch then. What facts do we agree on occur after she's on the porch? How does she get on the ground kicking and screaming and cursing and all that other stuff? I don't think that there is agreement about that. We say she was thrown to the ground and manhandled. So your view of the facts is everything's calm, she's on the porch, she's handcuffed, they take her off the porch and they just throw her to the ground and start abusing her. No, Your Honor. I don't believe that she was handcuffed on the porch. I thought you spent 10 minutes telling us that she was handcuffed on the porch. No, I apologize. No, Officer Seitz went to the porch to get her. It's our position that he tossed her onto the ground. On the porch. Well, from the porch. He threw her off the porch. Onto the ground and she was handcuffed once she was thrown to the ground. She was not handcuffed prior to being thrown to the ground the first time. Okay. Do we know, you know, was she thrown over a railing, thrown down the stairs? How did she get from the porch thrown onto the ground? Was she on the lawn of the house or? It's in downtown York. I don't believe there are any lawns. There's no yard. Correct, but Your Honor, I don't believe that there's any record evidence regarding that. Okay. So, I guess the point you're making is, which makes some sense, I think, is that if they arrested her for disorderly conduct before she was kicking and screaming and cursing, it's immaterial that she was kicking and screaming and cursing. Correct. That's the crux of your argument. It is. Okay. It's immaterial to the probable cause determination. It may be material for purposes of a jury in determining whether the force was reasonable. Right. And the other, but the other side of that coin, I think you would concede, maybe you won't, is that if they did a Terry stop and she's resisting and her resistance requires her to be taken to the ground, in which case she's kicking and screaming and cursing, they would certainly have probable cause to, at that time, arrest her for disorderly conduct, would they not? Well, correct, but I guess what I would argue, Your Honor, is that a Terry stop is an investigative detention. There was no investigation that took place. No one asked her a question. No one spoke to her. Figg waited in the car with his gun pointed at her till another officer arrived and said, grab her. Well, that's different than your answer to my question. My question was, when does Terry stop stop and when does arrest begin? And you said that Terry stop is up until the point in time that she's handcuffed off the porch, thrown to the ground off the porch and handcuffed.  I'm sorry, Your Honor, she wasn't thrown off the porch and handcuffed. She was not, I don't believe she was handcuffed on the porch. No, no, no, and handcuffed, not being handcuffed. I believe that it would be, I believe the arrest, the time that we are concerned about, is the moment at which the officer who made the decision about arrest made the decision. And that was when he directed sites to arrest her. I mean, the point in time of arrest is hugely important because that's the point in time at which we evaluate probable cause. Correct. All right, we need to talk about the station house now. Before we move on to the station house, Judge Nygaard, do you have any further questions about the arrest? No, thank you, Judge Hardiman, I'm fine. Okay, all right. Now, at the station house, it seems to go against you, Judge Basil, in the sense that your client was given an opportunity to identify two of the defendants for mistreating her at the station house during her hearing and she said the person was not in the courtroom. And in fact, she identified the person that was rough with her as the terminator. And it seems from the record clear that none of these three defendants is the so-called terminator. Is that right? Well, I believe the record is absolutely. I don't know whether Officer Seitz is the terminator or not. I don't have any idea. Well, your client gave a description of the terminator. What was the description your client gave of the terminator? I don't recall, Your Honor. Well, let me tell you. She said that he wasn't in the room and these defendants were in the room. Correct. And I think, didn't she also say the terminator was bald and these guys aren't? I mean, there were these discrepancies that seem to make it clear that neither Figg nor Monty nor Seitz could be this officer known in the community as the terminator. However, and particularly as a supervisor, all of the officers, it's our position, had a duty to intervene in what was a very obvious use of force where Ms. Williams is. Fair enough. And they can be liable on that basis. Sure, they could. But I didn't read the pleading. If you had pleaded that this officer, last name unknown, called the terminator, had manhandled your client upon the instruction or with the acquiescence of these defendants, then maybe these guys are in trouble for that. But I didn't read the pleading to be that or the discovery to yield that. Rather, you seem to have a problem under our decision in Joukowsky because while you can file a complaint saying that your client suffered false arrest, malicious prosecution, excessive force by John Does 1, 2, and 3, it's pretty clear, I think, correct me if I'm wrong, under our jurisprudence, that during the discovery process, you have to ascertain who did what to whom at what time. And I don't see anything in this record to indicate that Seitz, Monti, or Figg did anything wrong to your client at the station. We do have, I think, undisputed facts that one of the officers, I forget which one, handcuffed her, I think her right hand, but she's complaining about the other officer who was doing painful things to her left hand. Do I understand that correctly? I think the answer, Your Honor, is yes. However, pleading, amendment of pleading should be liberally allowed and the pleading can be amended up until the time of trial. It can be amended all the way up until the time the case goes to the jury for verdict. But Rule 56 requires that you put your best foot forward factually at the time that the motion for summary judgment is made. And I don't see anything in the record to indicate that you've identified any of these three people doing anything wrong at the station house. Is there anything in the record to support that? Other than being present on the scene. Clearly, there's evidence that one or more of them were present at the station house. But as far as mistreating your client, I don't see anything in the record to support that. The basis of any claim against those officers would be a failure to intervene claim. That is correct. Failure to intervene, okay. That is correct. Pardon? Is that pleaded? I don't, I didn't draft that, your honor. Okay. Okay. And I suppose, you know, we don't have to get into Johnson with you because you'd be more than in agreement with us that Johnson deprives us of jurisdiction to counterman what the district court said about what facts are material or not. Do you have anything you want to offer on that before we grill Mr. Lavery about that a little further? If your honors have no further questions, I'm satisfied. Thank you. Judge Nygaard, anything further for Ms. Basil? Thank you, no, Judge Harlan. Okay. Thank you very much, Ms. Basil. Thank you. We'll hear rebuttal from Mr. Lavery. Thank you, your honors. Just briefly, first of all, on the Terry stop versus arrest, and I agree with your honors, the point where arrest was made is extremely important here. You can't handcuff as part of a Terry stop if the person needs to be handcuffed at that point. So the fact that handcuffing occurred does not automatically make it an arrest at that point. It can still be a Terry stop. The other point I just want to make very... Oh, but, but, okay, fine. But is there anything in the record to undermine what Ms. Basil said about the fact that Ms. Williams was tossed off the porch and handcuffed before she started acting unruly? No, she was not handcuffed at that point, your honor. I think... When did she get... How do we know when she was handcuffed? Well, she was not handcuffed while she was on the porch. I think Ms. Basil conceded that... No, she said she was thrown off the porch and then handcuffed on the ground. Exactly. Is that true? Well, I think for purposes of this, you would have to accept the fact that she was thrown onto the ground by sites who then handcuffed her. Our argument is that under the circumstances of this, the undisputed ones that are clear here, and you can take district court's opinion on that, that it would not violate clearly established law for a reasonable police officer to do that under those circumstances. At that point, FIG says handcuff her at that point. That can be done as part of a legitimate Terry Stopp investigatory... But why wouldn't throwing her off the porch be excessive for this? What? How do we know they had a right to throw her off the porch? How do we know she wasn't... You know, she's banging on the door, they don't let her in, the police officer shows up on the porch. How do we know that she's not going to be compliant then and start complying with the order? Because at that point, she hasn't been... We do know she hasn't been compliant up to that point, number one. Number two, again, you're talking a reasonable police officer, again, under the circumstances, within two minutes, not knowing who this person is, knowing that this person, unlike the other one, is banging on that door trying to get in and get away at that point from them. I think it's not unreasonable at that point that that officer wants to get her to the ground. And again, I mean, was that the best way to do it? I mean, I would say probably under the Arthur Murray dance school method. No, it wasn't, probably. You don't want to do that with your partner. But under the circumstances, then and there presented to these guys, again, not in the quiet of the judge's chambers or the courtroom, this is what cops deal with. They got to make that split-second decision. And that's an unreasonable decision. Now, if he had thrown her to the ground and started beating on her, yes, that would create an issue. But I don't believe the law is clearly established under these circumstances that a reasonable officer could not take her to the ground and throw her to the ground because that's where you want her at that point to get her out of control. What's that? During a Terry stop? Yes, given at that point, yes. So you're asking us to articulate a rule of law that says during a Terry stop, an officer can take someone and throw them to the ground. During a Terry stop. No, I'm not saying it was just the Terry stop. I'm saying that was part of it. But there was also probable cause at that point, and this is one, for escape. Isn't it one or the other? Isn't it Terry stop or probable cause? It could be both, judge, and here's why. Because at that point, it was a Terry stop for the original incident, but it was also probable cause for escape because he had told her at that point to stop. She did not stop. How far she went is another matter.  Only escape can help. Well, escape can help. Because she was not kicking and cursing, etc. when she was on the porch. That happened after she was thrown to the ground. Exactly, your honor. I agree with that. But the arrest, what I'm saying is the arrest at that point was not made until afterwards, and it was made on both basis. It was made on escape, but there was clearly probable cause at the time she was thrown to the ground to arrest her for escape. Okay. Now, what about the three men? I mean, Judge Phipps raised this issue and Ms. Basil pointed us to the transcript. The radio transmittal said it was three men in the car. So what are they doing fussing with a woman? Well, what they're doing fussing with a woman, Judge, which is a good way to put it, actually, is, I mean, I don't mean to be cavalier about it, but I wonder why an officer on the field told three men when he sees a woman, he should immediately think, well, that's not my guy. I got to find a guy. He's in line at the time of the pursuit and he sees the three people go out of the car and he can't tell who they are at that point, whether they're male or female at that point. We resolve that fact in Plaintiff Appellee's favor, right? Surely that fact at this stage we resolve in Plaintiff Appellee's favor, right? That there was a report over the radio that there was three males? Yes, of course. And that she's a woman, that she was not part of what was reported over the radio. Yes, but what's also undisputed is that Fig was part of that caravan and that Fig saw the three people jump out and Fig couldn't tell one way or another. Let me ask you this question. And this question, I just want to know if you agree with this statement or not. So, and this applies in the context of qualified immunity. And it's a quote. So, why don't you tell me if you agree with this quote or not? Where the district court denied summary judgment for a purely legal reason, we do not have jurisdiction, but we must, we do have jurisdiction, but we must adopt the facts assumed by the district court, unquote. Do you agree with that statement or not? The facts assumed by, I mean, actually. You must adopt the facts assumed by the district court. As long as you can tell what those facts were, yes. And so, so that means, so if you agree with that, that means that all we're looking at is the district court's assessment of the facts in this case. And all the sites to the record are not part of our review at this stage, if that statement is true, which you agreed with. I agree with that statement, if those facts that are assumed have actually been assumed in this case. What I'm saying in this case, Your Honor, is the facts that are clear and of record, even if you read the district court's opinion, establish the basis for qualified immunity. That's what I'm saying. But it, but we don't do any other fact finding. I don't think we need to. I really don't. I could take that opinion. I get your five facts right there that are going to say essentially, this is a qualified immunity case. Well, I don't know. I didn't see the district court necessarily following our jurisprudence regarding how to deal with Rule 56.1 statements because I don't see clear statements, findings by the district court. I don't see clear findings about what happened during the alleged false arrest. I don't see any clear findings regarding what happened at the station house. I don't see much discrimination among the three defendants. And our case law is pretty clear that you can't just say a bunch of officers violated my rights. You've got to, you've got to identify who did what to you at what particular time. Isn't that, isn't that our case law? I agree. And that's why I was saying to, to Your Honor, who questioned me, that I agree with that as long as we know what facts they did assume. But, and here's a lot we don't know. So why shouldn't we just vacate and remand and ask the district court to more clearly and precisely parse the many facts? You know, I was going through with both you and Ms. Basil in some excruciating detail what we agree on and what we don't agree on are the facts here. And why should this court at this time try to hash that out rather than just putting the onus on the district court to do that in the first instance? I don't disagree with you, Your Honor. That should have been done and it wasn't there. I do believe there is case law that says when that's not done, though, that this court can find the facts that are there in the records. And, and again, I don't think they're that... Sorry to interrupt, but do you have a citation for that? You said you believe there's case law. Your co-counsel might have a citation. Yeah, yeah, please. Yeah, one of them is Rivas versus Passaic. I'll cite it in your brief, is it? Yeah, I'm trying to get the... The cite is 365 F3rd 181 196 and it's in footnote 10. And the quote is, to the extent that there are any gaps in the district court's factual recitation, we can determine what facts the district court in the light most favorable to the non-moving party likely assumed. At that point. And then under Brown v. Armetti, which is 247 F3rd 69 at page 78. It says Johnson does not foreclose an appellate court from scrutinizing the evidence put forward by the plaintiff following a qualified immunity summary judgment motion at that point. And the Barron's case, I think, also says at that point as well, when the district court fails to make an appropriate factual finding to facilitate review, the Court of Appeals may have to undertake a cumbersome review of the record to determine what facts the district court likely assumed. Which again, would be essentially what Rivas says as well. So, there we have it. We have the ability to do that, but we're not required to. Right? That's what those cases say. Yeah, I think so, Judge. Judge Nygaard, do you have any questions for Mr. Lavery? Thank you, no, Judge. Okay. Thank you, Mr. Lavery. Thank you, Ms. Basil. The court will take the matter under advisement.